50 A.3d 1127

**Dexter INGRAM**

v.

**STATE of Maryland.**

**No. 121, Sept. Term, 2011.**

Court of Appeals of Maryland.

Aug. 21, 2012.

718

Andrew V. Jezic and David H. Moyse (Jezic, Krum & Moyse, LLC, Wheaton, MD), on brief, for petitioner.

Todd W. Hesel, Honors Attorney (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

HARRELL, J.

On 16 July 2009, a grand jury in the Circuit Court for Montgomery County indicted Petitioner, Dexter Ingram, on charges of manslaughter by motor vehicle, reckless driving, failure to remain at the scene of an accident resulting in death or bodily injury, and engaging in a race or speed contest, arising from a 2008 traffic incident. A jury trial ensued over 26–30 April 2010. Prior to closing argument at that trial, the trial judge prohibited, on motion of the prosecutor, Ingram's defense counsel from including in his anticipated argument an explanation of the significance of the legal thresholds of suspicion, reasonable articulable suspicion, probable cause, and a "tie," by way of contrasting these thresholds along the continuum of standards, leading to the one in play in Ingram's case, proof beyond a reasonable doubt. The trial court allowed, however, Ingram's counsel to explain to the jury, for the same purpose, the thresholds of preponderance of the evidence and clear and convincing evidence, as well as to render a lengthy dissertation on the significance of the burden of beyond a reasonable doubt. The jury found Ingram guilty of reckless driving and failure to remain at the scene of an accident resulting in bodily injury, but not guilty of manslaughter by motor vehicle, participating in a race or speed contest, and failing to remain at the scene of an accident resulting in death. The trial judge sentenced Ingram to five years in prison, with all but 18 months suspended, five years of probation upon his release, and ordered him to pay a $500 fine.

Ingram filed timely an appeal to the Court of Special Appeals, arguing, among other points, that his convictions should be reversed and a new trial awarded, because the trial court "unduly restricted" his counsel during closing argument by limiting which comparative standards of proof he could argue to the jury. The Court of Special Appeals affirmed

Ingram's convictions in an unreported opinion. Ingram petitioned this Court for a writ of certiorari, which we granted on 8 February 2012. *Ingram v. State*, 424 Md. 628, 37 A.3d 317 (2012). For reasons we shall explain, we affirm the intermediate appellate court's judgment because the trial court's refusal to allow a discussion of extraneous legal standards was not an abuse of its broad discretion in controlling the scope of closing argument so as to avoid potential confusion of the jury. Moreover, even were we to assume that an abuse of discretion occurred in this regard, it would be harmless error, due to the otherwise wide latitude given to Ingram's counsel during the closing argument.

## I. The Evidence at Trial

On the evening of 9 December 2008, a black Nissan 350Z, driven by Ingram, and a silver Honda Civic, driven by Jeffery Nunez, were traveling closely to each other in a northbound direction on the multiple lane Rockville Pike in Bethesda, Montgomery County, Maryland. At approximately 8:10 p.m., Ingram's vehicle veered suddenly into the leftmost lane, about a car length in front of Nunez's car, cutting off Nunez. Nunez's car swerved into the median, launched into the air, and landed in a southbound lane of Rockville Pike, on top of a white Toyota Camry, driven by Xuan Lai. Lai died from the multiple injuries she sustained in the crash.

Based on the crash data compiled from the accident scene, the lead police investigator testified at trial that Nunez was exceeding the posted speed limit of 40 miles per hour by 26 miles per hour at the time his car struck the median. Ingram presented a defense expert who calculated that Nunez was traveling only seven miles over the speed limit at the time. Several eye-witnesses testified that, prior to the crash, Ingram's and Nunez's vehicles were traveling at a high rate of speed. One witness stated that she "had no doubt they were racing."

Ingram's trial version of events was that, after he "merged"

into the lane ahead of Nunez, he heard a "loud boom sound." [1]
He looked into his rearview mirror and "saw two lights turn to
the left-hand side." Ingram did not stop to investigate. In-
stead, he proceeded to a nearby parking lot, intending to visit
an adjacent electronics store. Also parked in the same lot, a
State's witness overheard Ingram talking excitedly on his cell
phone about a traffic incident. He heard Ingram say, "Oh no,
I can't go back. No, I can't go back there." After leaving the
parking lot, Ingram turned his vehicle southbound, in the
direction of where the crash occurred, but the road was
blocked off by the police. Sometime later, Ingram's employer
reported him to the police after he overheard Ingram discuss-
ing the incident with a co-worker on the job.

At the end of all of the evidence and before closing argu-
ment commenced, the State requested that the trial judge
instruct Ingram's counsel that he may discuss in his expected
closing argument only the preponderance of the evidence and
beyond a reasonable doubt standards, rather than allowing
him to use a graphic display (his "board") that outlined a
gamut of seven progressively different burdens of proof.[2]
Ingram's counsel described anticipatorily and for the record
his "board" and intended method of presentation:

At the bottom, it says suspicion, and I would talk about
that that's, you know, can't even stop somebody for suspi-
cion. Reasonable articulable suspicion is next up. I would
talk about, very briefly, that that allows the police to stop
somebody for a very brief time to confirm or dispel suspi-
cion of criminal activity.

Then probable cause is next up, and I'd say that allows,
generally, that allows the police to go in somebody's house

---

**1.** Initially Ingram did not tell police that he heard the sound. Ingram
explained that he did not inform the police about the booming sound he
heard after he cut-off Nunez's vehicle because he "had a feeling I was
involved in something and I was scared."

**2.** The State moved preemptively because Ingram's counsel was well-
known among Circuit Court habitues for his use of this broad presenta-
tion of legal standards of proof in his closing arguments, at least in
criminal cases.

after a judge signs a warrant, confirming that's there probable cause of evidence of a commission of a crime in somebody's home, or it allows the police to arrest somebody based on probable cause of a felony having been committed without a warrant.

Next is a tie, 50 percent. Next is "Preponderance of the Evidence," and I would just simply say, in a car accident case, in order to prove negligence and to get money, the plaintiff just needs to push the ball slightly past midfield. It's a slightly tipping of the scales at 51 percent.

Next is "Clear and Convincing." I would say that in certain fraud civil cases, it's the burden of proof where the plaintiff is required to show their cause of action by clear and convincing evidence in order to convince a jury to give them money for certain civil fraud actions. And then "beyond reasonable doubt" is above "clear and convincing" and that is what is required in a criminal case.

The parties argued *Drake v. State*, 186 Md.App. 570, 975 A.2d 204 (2009), *rev'd on other grounds*, 414 Md. 726, 997 A.2d 154 (2010), as relevant to the issue. In *Drake*, the Court of Special Appeals upheld a trial court's decision to allow in a defendant's closing argument in a criminal trial only an explanation of the standards of preponderance of the evidence and beyond a reasonable doubt. 186 Md.App. at 598, 975 A.2d at 220.

The trial judge refused to allow Ingram's counsel to present to the jury his arguments about suspicion, reasonable articulable suspicion, probable cause, and a "tie." The judge did permit, however, Ingram's counsel to discuss preponderance of the evidence, clear and convincing evidence, and beyond a reasonable doubt in his closing argument, explaining that they are ultimate trial "standards of proof," but the other four standards were "not appropriate" because a jury in a criminal case would not be called upon to consider them. Prior to the closing arguments, the trial judge gave, among others, the pattern jury instructions on presumption of innocence and reasonable doubt.[3]

---

**3.** These instructions were given in accordance with MPJI–CR 2:02:

Ingram's counsel presented a lengthy, cohesive explication of reasonable doubt. He began by describing the history of reasonable doubt and characterized it as, "the highest level of proof in our American jury system," "a sacred right," and requiring the willingness on the part of the fact-finder to "act upon such a belief without reservation." He then argued individually the application of the standard of reasonable doubt to each of the charges against Ingram in order to stress the level of certainty required to find his client guilty. Counsel emphasized also the importance of the binding nature of the trial court's instructions and that the burden of proof is on the State. After discussing the various charges at length, Ingram's counsel returned to the standard of reasonable doubt and compared it in lay terms to a spectrum of lesser thresholds of proof:

> If you think maybe, no way. If you think probably, no way. If you think likely, no way. If you think very likely, no way. If you think very highly likely, no way. Only when it's I know beyond a reasonable doubt and that's only when you can take away the liberty interest, all right.

Defense counsel transitioned next to a discussion of the standards of preponderance of the evidence and clear and convincing evidence (in comparison to reasonable doubt), stating:

> The defendants are presumed to be innocent of the charges. This presumption remains with the defendants throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendants are guilty.
>
> The State has the burden of proving the guilt of the defendants beyond a reasonable doubt. This burden remains on the State throughout the trial. The defendants are not required to prove their innocence. However, the State is not required to prove guilty beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.
>
> A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. However, if you are not satisfied of the defendant's guilt to that extent then reasonable doubt exists and the defendant must be found not guilty.

Preponderance of the evidence. It's a standard of proof. In a civil case when the plaintiff is trying to prove negligence, okay, the plaintiff or the person bringing the lawsuit has the burden of proof by preponderance of the evidence. That's just tipping the scales and then a jury can give the claimant money.

That's preponderance of the evidence. Just tipping the scale slightly. Some people said pushing the ball slightly past mid field, okay? Just past that mid-point mark. That's preponderance of the evidence. That's in a civil case. Other civil cases are clear and convincing evidence. Clear and convincing evidence. That's when a civil claimant proves fraud and a civil claimant, somebody files a lawsuit and get money for fraud. It's clear and convincing evidence. It's that.

But in an American criminal trial it's beyond a reasonable doubt. It's way beyond clear and convincing. Think about it. Are you clear? I'm clear. Are you convinced? I'm convinced. Well clear and convincing is not enough in an American criminal trial. It's beyond a reasonable doubt.

Defense counsel concluded with a warning of the dangers of compromise and reemphasized that the burden of proof is on the State. As noted earlier in this opinion, Ingram was convicted of reckless driving and failure to remain at the scene of an accident resulting in bodily injury and acquitted of manslaughter by motor vehicle, participating in a race or speed contest, and failing to remain at the scene of an accident resulting in death.

Ingram filed timely an appeal to the Court of Special Appeals, presenting three questions, including the following: "Did the circuit court properly exercise its discretion when it restricted defense counsel's closing argument?"[4] The Court of Special Appeals affirmed, in an unreported opinion, Ingram's convictions. In upholding the trial court's judgment,

---

**4.** The other questions presented to the Court of Special Appeals were not presented in Ingram's petition for writ of certiorari to us and, consequently, we do not consider them.

the intermediate appellate court explained that the trial court acted reasonably and within its broad discretion to reduce juror confusion by prohibiting the discussion of irrelevant evidentiary standards. The Court of Special Appeals relied, in large part, upon its opinion in *Drake,* where it upheld a trial court's decision to deny a defense counsel's request to discuss a number of lesser standards and burdens not implicated directly in the particular criminal case. Ingram petitioned this Court for a writ of certiorari, which we granted on 8 February 2012, 424 Md. 628, 37 A.3d 317 (2012), in order to consider the following question:

> Did the lower court err by relying on *Drake v. State,* 186 Md.App. 570, 975 A.2d 204 (2009), and limiting trial counsel's attempt in closing argument to compare the State's burden of proof beyond a reasonable doubt to other legally recognized standards of proof?

We conclude that the trial judge's refusal to allow a discussion of the extraneous, extrinsic, and largely irrelevant legal standards in this criminal trial was not an abuse of his broad discretion to control the scope of closing argument calculated to reduce the potential for juror confusion. Moreover, even were we to assume for the sake of argument that an abuse of discretion occurred, it would be harmless error on this record, due to the wide latitude given actually to Ingram's counsel to argue more comparable standards to the one to be applied actually by the jury. Accordingly, we affirm the judgment of the Court of Special Appeals.

## II. Standard of Review

A trial court is in the best position to evaluate the propriety of a closing argument as it relates to the evidence adduced in a case. *Mitchell v. State,* 408 Md. 368, 380–81, 969 A.2d 989, 997 (2009). As such, we do not disturb the trial judge's judgment in that regard unless there is a clear abuse of discretion that likely injured a party. *Grandison v. State,* 341 Md. 175, 225, 670 A.2d 398, 422 (1995). A trial court abuses its discretion when its "ruling either does not logically follow from the findings upon which it supposedly rests or has

no reasonable relationship to its announced objective." *McLennan v. State,* 418 Md. 335, 354, 14 A.3d 639, 650 (2011).

## III. Discussion

The State and Ingram agree that the evidentiary and legal standards or thresholds of suspicion, reasonable articulable suspicion, probable cause, and a tie "were not generated by the evidence or in any way relevant to the issues before the jury." This lack of relevance establishes, as the State sees it, that Ingram was not entitled to engage before the jury in a discussion of these standards. The State argues also that the ruling should be upheld on the grounds that it is well within the broad range of discretion afforded the trial judge in regulating the course of a trial. Ingram's arguments for reversing the trial court's judgment fit largely into two categories: (1) the wide latitude afforded counsel to engage in "oratorical flourishes" and allusions during closing argument should permit the proposed discussion of otherwise extraneous legal standards; and (2) the discussion should be permitted because it would give the jury a helpful hierarchal context to understand better the highest standard of beyond a reasonable doubt.[5]

## A. Abuse of Discretion

During closing argument, counsel must confine his or her oral advocacy to the issues in the case, but is afforded generally wide latitude to engage in rhetorical flourishes and to invite the jury to draw inferences. *Degren v. State,* 352 Md. 400, 430, 722 A.2d 887, 901–02 (1999). At the same time, a trial judge has broad discretion to control the scope and duration of counsel's closing argument in order to ensure fairness. *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct.

---

5. Ingram maintains also that it is necessary for counsel to make the comparisons he desired because the pattern jury instruction for reasonable doubt is inadequate. The adequacy of the pattern jury instruction on reasonable doubt was not presented as a question in Ingram's petition for certiorari and, thus, will not be addressed here. Md. Rule 8–131(b).

2550, 2555, 45 L.Ed.2d 593, 600 (1975); *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707, 714–15 (1974). The determination of whether a portion of counsel's argument is improper or prejudicial rests largely within the trial judge's discretion because he or she is in the best position to determine the propriety of argument in relation to the evidence adduced in the case. *Mitchell,* 408 Md. at 380–81, 969 A.2d at 997. Although this Court has not ruled previously on the propriety of a trial court's specific exclusion from closing argument in a criminal case of discussion of extraneous legal standards, we demonstrated deference to the trial court's exercise of discretion to control the scope of closing argument. *Wilhelm,* 272 Md. at 413, 326 A.2d at 714–15.[6] Due to the binding nature of the trial court's jury instructions on reasonable doubt, the substance of the instructions are not subject to debate by counsel before the jury during closing argument. *Montgomery v. State,* 292 Md. 84, 91, 437 A.2d 654, 658 (1981).[7] The

---

**6.** In a number of cases where the prosecutor made a questionable remark, we upheld the trial court's exercise of discretion to allow the contested elements of argument, in light of mitigating circumstances. *Mitchell v. State,* 408 Md. 368, 969 A.2d 989 (2009) (stating that a trial court did not abuse its discretion in allowing the prosecutor's rebuttal remarks because they responded directly to remarks made by defense counsel in closing); *Evans v. State,* 333 Md. 660, 637 A.2d 117 (1994) (affirming a trial court overruling a defense objection because prosecutor's statements were matters of common knowledge); *Henry v. State,* 324 Md. 204, 596 A.2d 1024 (1991) (upholding ruling to allow an argument because the prosecutor's rebuttal remarks were in direct response to defense counsel's remarks). Although these cases concerned a trial court's admission of remarks during closing argument, rather than prohibition, they serve to illustrate the latitude given to trial judges to determine the propriety of closing argument in relation to the evidence in each case. *Mitchell,* 408 Md. at 380–81, 969 A.2d at 997.

**7.** Although we have not elaborated expressly what is considered "debating the law" (and will not do so now), we note that the Court of Special Appeals concluded that a trial court, in order to avoid the risk of jury confusion, has the power to restrict counsel from arguing to the jury against the court's instructions regarding the standard of reasonable doubt. *White v. State,* 66 Md.App. 100, 118, 502 A.2d 1084, 1093–94 (1986); *Newman v. State,* 65 Md.App. 85, 101–02, 499 A.2d 492, 500–01 (1985). We mention *Newman* and *White* not to insinuate that Ingram's counsel intended to debate the law pronounced by the judge's instructions, but rather to highlight the extent of a trial court's discretion.

trial court is required to adhere "closely" to Maryland Criminal Pattern Jury Instruction 2:02 when instructing the jury on the reasonable doubt standard. *Ruffin v. State,* 394 Md. 355, 371, 906 A.2d 360, 370 (2006). The purpose of requiring a uniform reasonable doubt jury instruction is to "eliminate confusion and foster fairness for defendants, the state, and jurors alike." *Ruffin,* 394 Md. at 369, 906 A.2d at 370. Although there is no analogous rule establishing explicit boundaries for counsel expounding upon the reasonable doubt pattern jury instruction, allowing counsel to expand too far afield upon the trial court's binding jury instructions during closing argument carries with it a similar danger that the jury may misapply the law. *White v. State,* 66 Md.App. 100, 118, 502 A.2d 1084, 1094 (1986).

Ingram's first argument, that the trial court impinged upon the wide latitude afforded to counsel during closing argument, is unconvincing. As this Court pointed out in *Degren,* counsel is not entitled to discuss issues outside the scope of the case at hand. 352 Md. at 430, 722 A.2d at 901–02. Ingram concedes that his proposed discussion of the standards of proof was not generated by the evidence, but points to *Wilhelm,* arguing that his intentions were merely permissible oratorical flourishes or allusions. In *Wilhelm,* the defense argued that the prosecutor's characterization of the victim's murder as part of the significant murder rate in Baltimore City at the time was prejudicial and grounds for a mistrial. We concluded that the trial court's refusal to grant a mistrial on the basis of the prosecutor's closing argument was not an abuse of discretion because the contentious comment was a matter of common knowledge at the time. *Wilhelm,* 272 Md. at 438–46, 326 A.2d at 728–32. Despite the fact that this Court upheld in *Wilhelm* the allowance by a trial judge of a remark, rather than a ruling to exclude it, *Wilhelm* demonstrates nonetheless our ordinary deference to the trial court's exercise of discretion in such matters. Further, even though the reasoning in *Wilhelm* supports allowance of counsel to urge the use of inferences and deductions in closing argument,

it requires that counsel's arguments "be confined to the issues in the case on trial." 272 Md. at 413, 326 A.2d at 714–15.

In *Drake*, as analyzed by the intermediate appellate court, Drake's counsel sought to contrast the "in play" standard of reasonable doubt with the extraneous and inapplicable (in the posture of that case) standards of reasonable articulable suspicion, probable cause, and clear and convincing evidence. 186 Md.App. at 594, 975 A.2d at 218. The trial court allowed counsel to compare reasonable doubt only to preponderance of the evidence because of the possibility that the inclusion of the other extraneous standards might confuse the jury. *Id.* In upholding the trial court's decision to prohibit discussion of any additional standards in closing argument, the Court of Special Appeals echoed the trial court's rationale and found comfort also in the principle articulated in *Wilhelm* that closing argument should be confined to the issues in the case. *Drake,* 186 Md.App. at 598, 975 A.2d at 220.

The analysis in *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003), although an opinion of a sister state's high court, is persuasive because the case presents a similar scenario to Ingram's and provides additional, sound guidance for the proper exercise of discretion in similar contexts. In *Grillot,* defendant's counsel wished to show to the jury a chart comparing all the various standards of proof to that of reasonable doubt. 107 S.W.3d at 149–50. As in the present case, Grillot's counsel argued that he had a right to discuss extraneous standards in order to ensure the jury's understanding of reasonable doubt. *Id.* The Supreme Court of Arkansas concluded that this argument was unpersuasive, in light of the broad discretion afforded to the trial court to exclude improper arguments. *Id.* Like our appellate brethren in *Drake,* the Supreme Court of Arkansas affirmed, in the interest of guarding against jury confusion, the lower court's decision to prohibit discussion of the extraneous standards of proof. *Id.*

 *Drake* and *Grillot* demonstrate that extraneous legal standards may be deemed outside the latitude afforded counsel in argument and that such may be excluded by the trial court if deemed inappropriate or likely to lead to jury confu-

sion. By allowing a discussion of preponderance of the evidence and clear and convincing evidence that compares them to beyond reasonable doubt, the trial judge in the present case exercised his discretion in a less restrictive fashion than allowed in *Grillot* and *Drake.*

Ingram continues that his desired comparison of reasonable doubt to extraneous standards of proof may have been useful contextually for the jury nonetheless, pointing to: (1) the description of a jury's "probability spectrum" journey contained in the dissent in *Savoy v. State,* 420 Md. 232, 22 A.3d 845 (2011); (2) a variety of social science studies, some of which were mentioned in *Ruffin;* and, (3) our opinion in *Smith v. State,* 388 Md. 468, 880 A.2d 288 (2005) sanctioning a defense counsel's desire to argue asserted vagaries in cross-racial eye-witness identification testimony. The dissent in *Savoy* conceived that a jury, in its deliberations in a criminal trial, must travel an analytical spectrum of probability evaluation in order to determine if it can reach the polar extreme of guilty beyond a reasonable doubt because it must start necessarily from the opposite pole of the presumption of the defendant's innocence. 420 Md. at 266, 22 A.3d at 865. Thus, Ingram's counsel imagines that he should have been allowed to discuss all of the intervening legal standards (no matter how inapplicable in the given case) because of the jury's need to engage in such staged evolutionary thinking. The dissent in *Savoy* did not state, however, that it was *necessary* or desirable that counsel walk the jury through the probability spectrum in every case, nor did it state that it is *necessary* for the jury to understand where each extraneous legal standard fits along the spectrum. Further, the *Savoy* dissent provides no compelling reason for this Court to crimp trial courts' broad discretion to limit the scope of argument where they conclude that the introduction of extraneous legal standards may mislead the jury.

Ingram turns next to a variety of social science studies, including the studies mentioned in *Ruffin,*[8] to support his

---

**8.** Norbert L. Kerr & Robert S. Atkin, *Guilt Beyond a Reasonable Doubt: Effects of Concept Definition and Assigned Decision Rule on the Judg-*

contention that more context is good always for the jury. This Court used that data in *Ruffin*, however, to justify requiring trial judges to use the reasonable doubt pattern jury instruction as necessary to avoid confusing the jury. 394 Md. at 367–69, 906 A.2d at 368–70. The data in the studies alluded to in *Ruffin* suggested that often jurors misunderstood the instructions on reasonable doubt, largely because trial judges failed to provide regularly instructions with consistent content. *Id.* None of the additional studies that Ingram relies upon [9] state specifically that a presentation and discussion of all seven of the legal standards will aid necessarily a jury. The closest the data comes to supporting Ingram's contention are findings that individuals use anchoring "rules of thumb" to make judgments and that they can only identify up to "seven magnitudes of any one sensory stimulus." Kevin M. Clermont, *Procedure's Magical Number Three: Psychological Bases for Standards of Decision*, 72 Cornell L.Rev. 1115, 1140 (1987). These findings, like the rest of the social science data alluded to by Ingram, speak more to the adequacy of the pattern jury instruction (which is not at issue here) than the need for a discussion of all seven standards of proof in order for a jury to triangulate a workable understanding of reasonable doubt.

Ingram deploys *Smith* in support of his argument that more context is warranted for explaining evidentiary standards to juries. In *Smith*, we overruled a trial judge's decision to

---

*ments of Mock Jurors*, 34 J. Personality & Soc. Psychol. 282 (1976); Walter W. Steele & Elizabeth G. Thornburg, *Jury Instructions: A Persistent Failure to Communicate*, 67 N.C.L.Rev. 77 (1988); David U. Strawn & Raymond W. Buchanan, *Jury Confusion: A Threat to Justice*, 59 Judicature 478 (1976).

9. Kevin M. Clermont, *Procedure's Magical Number Three: Psychological Bases for Standards of Decision*, 72 Cornell L.Rev. 1115, 1140 (1987); William S. Laufer, *The Rhetoric of Innocence*, 70 Wash. L.Rev. 329, 348 (1995); Erik Lillquist, *Recasting Reasonable Doubt; Decision Theory and the Virtues of Variability*, 36 U.C. Davis L.Rev. 85 (2002); Elisabeth Stoffelmayr & Shari Seidman Diamond, *The Conflict Between Precision and Flexibility in Explaining "Beyond a Reasonable Doubt,"* 6 Psychol. Pub. Poly'y & L. 769, 774–75 (2000).

prohibit defense counsel from discussing in closing argument certain potential pitfalls associated with the reliability of cross-racial identification in eye-witness accounts, and particularly of a white person identifying a black person. 388 Md. at 489, 880 A.2d at 300. Ingram argues that this Court's tolerance of such in closing argument endorses here, by parity of reasoning, the allowance of the intended discussion of concededly extraneous legal standards. According to Ingram, a discussion in closing argument of potential cross-racial identification bias has a much greater potential for jury confusion because it touches upon a matter that is not necessarily common knowledge. The present case is distinguishable from *Smith* because here the contested legal standards in question are neither relevant to the evidence adduced in the case nor to the role the jury was about to be called upon to play. The attempted discussion of cross-racial identification in *Smith* was sanctioned on appeal because it related directly to the "sole piece of significant evidence" against the defendant, a white eye-witness to the crime who, in identifying Smith, a black man, as the perpetrator, bolstered her credibility by professing to have an uncommon ability to retain memories of people's faces she had seen only one time because of her training as an artist. 388 Md. at 488, 880 A.2d at 300. Thus, Ingram's reliance here on *Smith* is misplaced.

### B. Harmless Error

Even were we to conclude that the trial judge abused his discretion (which we do not), such abuse was harmless beyond a reasonable doubt (on this record), in light of the latitude granted actually to Ingram's counsel to argue otherwise. This Court will not overturn a judgment, even where error is found, unless it is likely that the proponent of the error was injured. *Grandison,* 341 Md. at 225, 670 A.2d at 422.

The trial court permitted Ingram's counsel to present a lengthy, cohesive argument that expounded upon the trial judge's use of the pattern jury instructions concerning reasonable doubt. Ingram's counsel contrasted reasonable doubt

with the ultimate decisional standards of proof that a criminal or civil jury may encounter: preponderance of evidence, clear and convincing evidence, and beyond a reasonable doubt. He gave descriptions and examples of these standards and explained that reasonable doubt "is way beyond clear and convincing."

Although instructed not to discuss the effect of reaching an equilibrium in persuasion (a tie), Ingram's counsel explained, in supplying additional context, that preponderance of the evidence was just "slightly past midfield" or the "mid-point mark." The trial court allowed additionally defense's counsel to guide the jury virtually along the probability spectrum mentioned in the dissent in *Savoy*, 420 Md. at 266, 22 A.3d at 8653. Beginning with "maybe," Ingram's counsel discussed "probably," "likely," "very likely," and "very highly likely," before it could attain the end of the spectrum, beyond a reasonable doubt.

As to reasonable doubt itself, Ingram's counsel deployed, without interference, a variety of descriptions, including "the highest level of proof in our American jury system," "a sacred right," and requiring the willingness to "act upon such a belief without reservation." Thus, the trial court afforded extensive latitude to Ingram. As noted earlier, the jury acquitted Ingram of three of the charges against him.

Then, there is the substantial evidence arrayed against Ingram as to the charges for which he was convicted. Several witnesses testified that they saw Ingram's vehicle traveling at a high rate of speed prior to the crash, seemingly in a race with Nunez's car. Ingram's vehicle was seen leaving the accident scene by several witnesses who saw the collision and the role played by Ingram in causing it. By Ingram's own admission, he changed lanes abruptly in front of the silver Honda, heard a loud boom, and saw two lights swerve to the left from behind his vehicle. A witness overhead Ingram, after he left the accident scene, talking excitedly on a cell phone in a nearby parking lot about a traffic incident, to which location where it occurred he did not wish to return. Ingram

admitted also that he did not inform the police about the booming noise he heard because he felt that he was involved in causing an accident and was scared. His boss overheard him discussing the traffic incident with a co-worker and reported him to the police, after Ingram failed to call them himself. The extensive latitude allowed by the trial court to discuss the standard of reasonable doubt, coupled with the evidence against Ingram, renders harmless any rhetorically assumed abuse of discretion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Chief Judge BELL joins the judgment only.